# IN THE UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| ANTIMO G. CANDEL, | )<br>) |
| Plaintiff, | )<br>) Case No: 1:13-cv-7500<br>) |
| v. | )<br>) Judge Ronald A. Guzmán |
| UNUM LIFE INSURANCE COMPANY<br>OF AMERICA, | )<br>)<br>) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

For the reasons stated below, Unum's motion for summary judgment [99] is granted. Civil case terminated.

## STATEMENT

Antimo Candel ("Candel") filed suit against Unum Life Insurance Company of America ("Unum") on July 11, 2013, claiming breach of contract. Unum removed the case to federal court on the basis of diversity of the parties on October 18, 2013. (Not. Removal, Dkt. # 1.) Candel filed an amended complaint on December 20, 2013, alleging a single count of breach of contract on the ground that Unum failed to pay Candel disability benefits to which he was entitled under three disability income insurance policies. (Am. Compl., Dkt. # 25.) This matter is before the Court on Unum's Motion for Summary Judgment filed February 16, 2015. (Mot. Summ. J., Dkt. # 99). For the reasons set forth below, the motion for summary judgment is granted.

**Facts**

*Insurance Policies*

Unum is a Maine corporation registered with the Illinois Department of Insurance, and offers various types of insurance policies. (Def.'s Stmt. Facts, Dkt. # 109, ¶ 3.) Candel purchased three disability income policies (collectively, "the Policies"), two from Unum in 1994 and a third from non-party Paul Revere Life Insurance Company in 1996. (Answer, Dkt. # 57, ¶¶ 3-4.)

The Policies entitle Candel to benefits upon a showing that he suffers "total disability," which is defined in the two Policies sold by Unum as occurring when:

> 1. injury or sickness restricts your ability to perform the material and substantial duties of your regular occupation to an extent that prevents you from engaging in your regular occupation; and
> 2. you are receiving medical care from someone other than yourself which is appropriate for the injury or sickness. We will waive this requirement when continued care would be of no benefit to you.

(Def.'s Exs. 7, 8, Dkt. # 102.) The comparable section in the Paul Revere Policy provides:

> "Total Disability" means that because of Injury or Sickness:
> a. You are unable to perform the important duties of Your Occupation; and
> b. You are receiving Physician's Care. We will waive this requirement if We receive written proof acceptable to Us that further Physician's Care would be of no benefit to You.…

(Def.'s Ex. 9, Dkt. # 102-9.) Under all three policies, a claimant must send the insurer written proof of loss within 90 days after the end of each period for which he seeks benefits. (Def.'s Stmt. Facts, Dkt. # 109, ¶¶ 9, 12.) Both policies, however, also provide that failure to meet the 90-day deadline will not affect the claim if proof of loss is furnished as soon as "reasonably possible" and within one year of the date it was required. (*Id*.) This one-year limit applies unless the claimant is "legally incapacitated" (in the Unum Policies) or "legally unable to notify" the insurer (in the Paul Revere Policy). (Def.'s Exs. 7-9, Dkt. # 102.) The Policies also contain a contractual limitations period for legal actions, providing that no legal actions can be initiated on

2

the Policies later than three years from the date that "proof of loss is required." (Def.'s Stmt. Facts, Dkt. # 109, ¶¶ 10, 13.)

*Candel's professional activities*

Because Candel's current suit hinges on the claim that he was both disabled and "legally incapacitated"[1] between April 2005 and July 2009 due to depression, obesity, and panic attacks, it is necessary to review his professional activities in some detail. Candel is a medical pathologist by trade, and held an active license to practice medicine in Illinois from 1990 to July 31, 2014. (*Id.*, ¶ 17.) Billing codes reflect that he performed thousands of anatomic pathology procedures between 2004 and 2010, including 3,837 procedures in 2004, 4,078 in 2005, 5,499 in 2006, 2,366 in 2008, 5,215 in 2009, and 4,101 through the first nine months of 2010. (Def.'s Exs. 24-26, Dkt. # 102.) Candel testified that his colleague Dr. Zarif "was the one that managed the case" in most of the procedures reflected in the records, and that Candel worked under his supervision. (Pl.'s Ex. 93, Dkt. # 134-9, pp. 151-52.) Dr. Zarif testified that while he reviewed Candel's work for typographical errors, he did not manage Candel and would not re-examine specimens to corroborate Candel's diagnoses. (Def.'s Ex. 12, Dkt. # 102-12, pp. 40-41.) Candel earned substantial income from his medical activities, having received somewhere between $219,203.00 and $724,898.00 in every year between 2005 and 2011. (Def.'s Stmt. Facts, Dkt. # 109, ¶ 16.)

Between 2005 and 2007, Candel worked for and held shares in Associated Laboratory Physicians, S.C., which provided pathology services to Ingalls Memorial Hospital, and personally performed surgical pathology examinations in that capacity. (*Id.*, ¶¶ 14, 18.) One of

---

[1] The Paul Revere Policy uses the language "legally unable to notify" rather than "legally incapacitated," but the parties make no effort to draw distinctions between these two phrases and the Court accordingly presumes that the two refer to the same essential standard. References to "legally incapacitated" in this opinion are intended to encompass both phrases.

3

his partners at Associated Laboratory testified that during his employment, Candel exercised medical judgment by performing specimen, frozen section, or cytological evaluations, interpreting lab reports, and creating diagnostic reports. (*Id.*, ¶ 19.) In his deposition, Candel testified that he "couldn't get nothing done" during this period and "was barely holding on." (Pl.'s Ex. 93, Dkt. # 134-9, pp. 46-47.)

Starting in 2003 and continuing until 2009, Candel was the president of Orizon Pathology Foundation, a limited liability company which provided pathology services to Holy Cross Hospital. (Def.'s Stmt. Facts, Dkt. # 109, ¶ 15.) In Candel's deposition, however, he testified that he "didn't do anything" while at Orizon and "it was really just basically appearances." (Pl.'s Ex. 93, Dkt. # 134-9, p. 119.) In 2008, Candel founded and signed the Articles of Organization for Community Pathology Associates, P.C., which provided pathology services to Holy Cross Hospital and in which he remained a partner until November 2011. (Def.'s Stmt. Facts, Dkt. # 109, ¶¶ 15, 24.) He also executed Community Pathology Associates' Operating Agreement in early 2009, appointing himself Chief Financial Officer and assigning him a 50% share in the corporation. (*Id.*, ¶ 25.) As CFO, Candel co-signed all checks written on the corporation's account until he left the company in November 2011. (*Id.*, ¶ 26.) In 2009, Candel came up with the idea to co-found a company called Virtual Pathology because he wanted to learn more about virtual digitized pathology systems. (Def.'s Ex. 3, Dkt. # 102-3, pp 54-55.) This company had one large client who did anal Pap smears, and because this type of procedure was relatively novel, Candel learned about the procedure through medical journals and quickly "became the anal Pap smear pathologist in this area." (*Id.*, pp 55-57.)

In 2009 and 2010, Candel performed surgical pathology consultations and tissue examinations, and prepared reports including his diagnoses. (Def.'s Stmt. Facts, Dkt. # 109, ¶

20.) On May 4, 2010, Dr. Zarif – the chairman of Holy Cross's Pathology Department and one of Candel's partners at Community Pathology Associates – signed a certification of Candel's competency verifying that Candel "is under no constraint or undue influence" and "is of sound mind." (Def.'s Ex. 23, Dkt. # 102-23.) Dr. Zarif testified in his deposition that Candel was of sound mind as of May 2010, and stated that Candel's decision-making capabilities never diminished in 2009 or 2010. (Def.'s Ex. 12, Dkt. # 102-12, pp 50-51, 74.) Candel testified that during his work with Dr. Zarif at Community Pathology Associates, he "issu[ed] some reports, but all of them were co-signed by Zarif." (Pl.'s Ex. 93, Dkt. # 134-9, p. 120.)

*Candel's hospital certifications and credentials*

Throughout his claimed disability/incapacitation period of 2005-2009, Candel sought and secured appointment and specialty privileges at two hospitals. Candel was reappointed to Ingalls Memorial Hospital on May 1, 2005, and was approved by the hospital for various pathology privileges and specialties. (Def.'s Stmt. Facts, Dkt. # 109, ¶ 29.) As part of his application to renew these credentials in December 2006, Candel certified to the hospital that he had no medical, physical, or emotional condition that would limit his ability to practice medicine. (Def.'s Ex. 40, Dkt. # 102-40.) An internist submitted two letters to Ingalls in April and October 2007, certifying that he had examined Candel and found that Candel was capable of practicing medicine. (Def.'s Stmt. Facts, Dkt. # 109, ¶¶ 37, 38.) Candel was reappointed by Ingalls in November 2007, and again approved for various privileges associated with pathology. (*Id.*, ¶ 39.) In June 2009, Candel submitted a Privilege Request Form to Ingalls in which he certified that he was "competent to perform the technical procedures as part of [his] desired clinical privileges." (Def.'s Ex. 51, Dkt. # 103-7.)

5

In November 2005, Candel applied for credentials to Holy Cross Hospital and certified to the hospital that he had no medical, physical, or emotional condition that would limit his ability to practice medicine.[2] (Def.'s Ex. 32, Dkt. # 102-32.) In connection with Candel's 2005 credentialing application, Holy Cross received certifications from various third parties attesting to Candel's competency, including: (1) a December 2005 letter from Ingalls Memorial Hospital stating that it had evaluated Candel and knew of no reason not to recommend him (Def.'s Ex. 34, Dkt. # 102-34); (2) a December 2005 evaluation by one of Candel's partners at Associated Laboratory, rating Candel's medical abilities highly and stating that he had never observed any mental health or drug dependencies that could impair Candel's ability to act as a doctor (Def.'s Ex. 35, Dkt. # 102-35); and (3) a December 2005 recommendation from another doctor who had worked with Candel for five years (Def.'s Ex. 36, Dkt. # 102-36). Candel accepted an appointment to Holy Cross in June 2006. (Def.'s Stmt. Facts, Dkt. # 109, ¶ 35.)

In August 2007, Candel requested several specialty privileges at Holy Cross, and certified that he was "competent to perform the technical procedures" involved in the privileges. (Def.'s Ex. 45, Dkt. # 103-1.) Ingalls Memorial Hospital again advised Holy Cross in September 2007 that it had evaluated Candel and found no problems that would prevent it from recommending him. (Def.'s Ex. 48, Dkt. # 103-4.) Likewise, in June 2009, Candel again submitted a re-credentialing form to Holy Cross which stated that he had no impairments that would prevent him from practicing medicine safely. (Def.'s Ex. 50, Dkt. # 103-6.) In both August 2007 and August 2009, Dr. Zarif recommended Candel for reappointment and stated that he had no concerns about Candel's competence. (Def.'s Stmt. Facts, Dkt. # 109, ¶¶ 43, 49.)

---

[2] He later renewed these representations in a similar re-credentialing form submitted in August 2007. (Def.'s Stmt. Facts, Dkt. # 109, ¶ 42.)

6

*Candel's personal and legal affairs*

On December 6, 2007, Candel's partners at Associated Laboratory forced him out of the company. (Def.'s Ex. 3, Dkt. # 102-3, pp. 271-72.) He called his lawyer the next day to discuss his legal options, and in April 2008 filed suit against his former partners in the Circuit Court of Cook County for breach of his employment agreement and breach of fiduciary duty. (Def.'s Stmt. Facts, Dkt. # 109, ¶¶ 53-54.) In the complaint in that suit, Candel took the position that his partners wrongfully terminated him for cause because none of the bases for cause specified in his employment agreement – including inability to perform his duties as a result of "incapacity due to physical or mental illness or otherwise" – existed. (Def.'s Ex. 60, Dkt. # 102-3, pp. 271-72.) Candel participated in his lawsuit in various ways, including providing several pages of factual details to his lawyers and reviewing the complaint before filing. (Def.'s Stmt. Facts, Dkt. # 109, ¶ 56.) In the course of litigating the lawsuit, Candel also submitted a sworn affidavit in which he stated "I am fully competent to testify." (Def.'s Ex. 62, Dkt. # 103-18.) Candel settled his lawsuit in 2011 for a series of 18 payments of undisclosed amounts. (Def.'s Stmt. Facts, Dkt. # 109, ¶ 58.) In addition to initiating and participating in the lawsuit against his former partners, Candel also personally prepared his federal and state tax returns for 2007, 2008, and 2009, and checked himself into – and out of – a drug rehabilitation resort in Mallorca, Spain. (*Id.*, ¶¶ 52, 59.) At no point during the relevant period was Candel ever adjudicated legally incompetent or had anyone else appointed to manage his affairs. (*Id.*, ¶ 60.)

*Candel's psychiatric history*

Candel was treated by Dr. Jaffe, a psychiatrist, between April 2005 and August 2005, and then again for two days in July 2009. (Def.'s Stmt. Facts, Dkt. # 109, ¶ 62.) Dr. Jaffe testified

that as of August 15, 2005, Candel was not psychotic, was able to make reasoned decisions, understood "what was being asked of him" in his life, and had his anxiety and depression under control. (Def.'s Ex. 73, Dkt. # 103-29, pp. 33-38, 47-48.) When Dr. Jaffe saw Candel for two sessions in July 2009, he believed that Candel needed psychotherapy and substance abuse treatment. (*Id*., pp. 12-13, 46.)

Candel also saw another psychiatrist, Dr. Halper, for two sessions in November 2008. (Def.'s Stmt. Facts, Dkt. # 109, ¶ 65.) Dr. Halper testified that Candel came to him to consult on Candel's obesity. (Def.'s Ex. 72, Dkt. # 103-28, p. 7.) Based on Candel's fast talking and "grandiose" boasts about his medical practice, Dr. Halper also suspected that Candel may have ADHD or bipolar disorder, but "wasn't certain of the diagnosis" and lacked "hard evidence." (*Id*., pp. 22-24.) After two further visits (one telephonically), Dr. Halper diagnosed Candel with ADHD but did not diagnose him with bipolar disorder because he "could not elicit symptoms or signs" of that condition. (*Id*., pp. 27-28.) Dr. Halper also diagnosed Candel with dysthymic disorder and a single episode of major depressive disorder in partial remission, based solely on Candel's report that he had been "depressed for years." (*Id*., pp. 27-32.) Dr. Halper concluded that Candel had "moderate difficulty" in social or occupational functioning, but noted that the only evidence of this was "the interpersonal conflict that he described with… Ingalls Hospital and one or more partners." (*Id*., pp. 36-38.) He prescribed psychotherapy for Candel, but Candel did not follow through on this recommendation. (*Id*., pp. 14, 40-42.) Candel did not undergo any form of psychotherapy between August 2005 and July 2009, and did not receive any psychiatric or mental health care other than his four visits to Dr. Halper and his month-long stay in the Mallorca rehabilitation resort. (Def.'s Stmt. Facts, Dkt. # 109, ¶ 61.)

Two forensic psychiatrists examined Candel's files in connection with this lawsuit. Dr. Greiner – a forensic psychiatrist retained as an expert by Unum – concluded that based on Candel's professional activities and earnings between August 2005 and July 2009, he had the capability to do work during that period. (Def.'s Ex. 80, Dkt. # 103-36, p. 9.) Dr. Greiner also concluded that Candel's ability to apply for hospital privileges and found or manage two businesses is "grossly inconsistent" with his asserted inability to file a claim for disability benefits. (*Id.*, pp. 3-4.)

Dr. Lahmeyer – a forensic psychiatrist retained as an expert by Candel – interviewed Candel, reviewed his files, and issued one assessment report and one rebuttal report responding to Dr. Greiner's conclusions.[3] (Pl.'s Stmt. Facts, Dkt. # 132, ¶ 3.) Dr. Lahmeyer concluded that Candel was "mentally and physically impaired" by his depression, substance abuse, obesity, sleep apnea, and "personality deterioration" prior to April 2005. (Pl.'s Ex. 89, Dkt. # 134-6, pp. 13-14.) Dr. Lahmeyer further concluded that "the nature and severity of [Candel's] mental impairments made it impossible for [him] to have insight into his situation. As a result he fought the concept of impairment and disability and thus was incapable of filing a claim for disability." (*Id.*, p. 14.)

*Candel's insurance claims*

Candel testified that he filed the claims in this case because he went to an insurance agent looking to take out a life insurance policy, and the agent asked him "What about disability?" (Pl.'s Ex. 93, Dkt. # 134-9, p. 288.) On August 5, 2010, Candel submitted a disability claim to

---

[3] Unum objects that Dr. Lahmeyer's report should be ignored in ruling on the summary judgment motion, because it was unsigned and was disclosed to Unum on the final day of expert discovery. This challenge appears only in Unum's response to Candel's statement of additional facts, a filing that is properly limited to factual matters and not a proper forum for legal argument. As Unum has failed to properly challenge Dr. Lahmeyer's testimony – such as via a motion to strike or exclude – the Court considers it in ruling on the motion for summary judgment.

Unum stating that he became disabled starting in 2007. (Def.'s Ex. 4, Dkt. # 102-4.) He submitted a new form in December 2010 alleging a new onset of disability date of April 16, 2005. (Def.'s Ex. 5, Dkt. # 102-5.) Unum paid Candel disability benefits for the period of April 21, 2005 to August 15, 2005, and also paid benefits for the period of July 1, 2009 to the present. (Def.'s Stmt. Facts, Dkt. # 109, ¶ 7.) On July 11, 2013, Candel filed this suit against Unum seeking benefits for the period of August 15, 2005 to July 1, 2009.

## Summary Judgment Standard

A district court will grant summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In determining whether a genuine dispute exists as to any material fact, a court must view all the evidence and draw all reasonable inferences in favor of the non-moving party. *See Weber v. Univ. Research Assoc., Inc*., 621 F.3d 589, 592 (7th Cir. 2010). It is not appropriate for the court to judge the credibility of the witnesses or evaluate the weight of the evidence; the only question on summary judgment is "whether there is a genuine issue of fact." *Gonzalez v. City of Elgin*, 578 F.3d 526, 529 (7th Cir. 2009). Summary judgment is appropriate only if the record, taken as a whole, establishes that no reasonable jury could find for the non-moving party. *See Sarver v. Experian Info. Solutions*, 390 F.3d 969, 970 (7th Cir. 2004).

## Discussion

Candel's amended complaint alleges that Unum breached the Policies by refusing to pay Candel benefits from the time he became disabled in 2005 to the time Unum began paying out

benefits in July 2009. (Am. Compl., Dkt. # 25 at 2-3.) Unum moves for summary judgment on two alternate grounds: (1) that this lawsuit is time-barred by the limitations period contained in the Policies; and (2) that Candel did not qualify as disabled under the Policies between August 2005 and July 2009 because he was not receiving medical care.[4] (Mem. Supp. Summ. J., Dkt. # 100.) Because the limitations period does indeed bar the instant lawsuit, it is not necessary to reach the question of whether Candel qualified as disabled under the Policies.

All of the Policies are clear that written proof of loss is required within 90 days of the period for which benefits are sought, meaning that Candel was required to make a claim on the Policies no later than three months after the onset of his disability. The policies also provide, however, that failure to meet this 90-day deadline will not automatically result in denial of the claim as long as (1) the claim was made as soon as reasonably possible, and (2) the claim is made no later than one year after proof of loss was required, unless the claimant is legally incapacitated. Legal actions must be brought within three years of the time when proof of loss is required.

Unum argues that these contractual provisions combine to bar Candel's breach of contract claim asserted here. Candel first filed a claim in August 2010 for disability starting in 2005, far beyond both the 90-day and one-year windows in which proof of loss is required. Moreover, he failed to file the instant case until mid-July of 2013, more than three years after even the end of the period for which he claims unpaid benefits (July 1, 2009). As such, Candel can maintain the instant suit if and only if he is somehow excused from complying with the proof of loss and limitations period provisions of the Policies. Candel argues that he was excused from complying with these deadlines due to incapacity; he argues that because the Policies' proof of

---

[4] Unum also argues that Candel cannot enforce the Paul Revere Policy in this suit, as Unum was not a party to that contract or in privity with a party. (Mem. Supp. Summ. J., Dkt. # 100, at 15.) Because Candel has failed to show entitlement to benefits under any of the Policies, it is unnecessary to address this argument.

11

loss provisions excuse a claimant from complying with the 90-day and one-year deadlines if he is legally incapacitated, the limitations period on legal actions must similarly be tolled for incapacity. Unum responds that under the policies, legal incapacity merely prevents late proof of loss from resulting in *automatic* denial of claims; it does not change the date when proof of loss is "required" and thus does not toll the three-year limitations period for bringing legal actions. It is not necessary to resolve this point of interpretation, however, because Unum is entitled to summary judgment even under Candel's preferred interpretation of the Policies. Candel is judicially estopped from asserting legal incapacity as an excuse for bringing this action outside the limitations period, and has in any case failed to produce evidence sufficient to create a triable issue of fact as to whether or not he was legally incapacitated during the relevant period.

As an initial matter, the doctrine of judicial estoppel suggests that Candel should not be permitted to benefit from arguing that he was incapacitated from 2005 to 2009, in light of his prior lawsuit against his partners. Judicial estoppel is not a rigidly codified doctrine, but rather "a matter of equitable judgment and discretion" exercised by courts in order to prevent a litigant from successfully arguing two inconsistent positions in different legal actions. *In re Knight-Celotex, LLC*, 695 F.3d 714, 721 (7th Cir. 2012). As such, the doctrine is "intended to prevent the perversion of the judicial process" and is brought to bear when "intentional self-contradiction is being used as a means of obtaining unfair advantage" by a litigant. *Matter of Cassidy*, 892 F.2d 637, 641 (7th Cir. 1990) (quoting *Scarano v. Central R. Co.*, 203 F.2d 510, 513 (3d Cir. 1953)); *see also Chaveriat v. Williams Pipe Line Co.*, 11 F.3d 1420, 1428 (7th Cir. 1993) ("By making [litigants] choose one position irrevocably, the doctrine of judicial estoppel raises the cost of lying"). In short, application of judicial estoppel "protects the courts from being manipulated by chameleonic litigants who seek to prevail, twice, on opposite theories."

*Grochocinski v. Mayer Brown Rowe & Maw, LLP*, 719 F.3d 785, 795 (7th Cir. 2013) (affirming a district court's application of judicial estoppel on summary judgment) (internal quotation omitted). The Supreme Court has noted that judicial estoppel is "not reducible to any general formulation of principle," but that certain factors "typically inform the decision whether to apply the doctrine in a particular case." *New Hampshire v. Maine*, 532 U.S. 742, 750 (2001) (internal quotation omitted). These conditions include: (1) that a party's later position must be clearly inconsistent with a position it took earlier; (2) that the party asserted the earlier position successfully in an earlier proceeding; and (3) that the party seeking to assert the inconsistent position would derive some unfair advantage from doing so. *See id*. at 750-51.

All of these factors are clearly present in this case. As noted in the fact section above, Candel explicitly alleged in his earlier lawsuit that he was not under any mental or physical impairment in 2007 that would render him unable to practice medicine and justify terminating him for cause. He admits that he not only made this allegation in his complaint, but also swore under oath in an affidavit that he was competent to testify as of February 23, 2009. That contention was critical to his claim in his prior lawsuit; if Candel had indeed been suffering from incapacitating mental health issues in 2007, his partners would have had good cause to force him out of the partnership. His argument now – that he was laboring under mental issues so severe as to be not only totally disabling but legally incapacitating – is unquestionably inconsistent with that earlier position. He also prevailed in his earlier suit, having extracted a settlement from his former partners that, while undisclosed as to total value, consisted of 18 payments. Obtaining a settlement in one's favor qualifies as prevailing on an earlier inconsistent theory for purposes of judicial estoppel under both federal and Illinois precedent. *See Kale v. Obuchowski*, 985 F.2d 360, 361-62 (7th Cir. 1993) ("Persons who triumph by inducing their opponents to surrender

have 'prevailed' as surely as persons who induce the judge to grant summary judgment"); *G.M. Sign, Inc. v. State Farm Fire & Cas. Co.*, 18 N.E.3d 70, 82 (Ill. App. Ct. 2014) (holding that a party was barred from arguing a new position after "[h]aving obtained the benefit of its settlement agreement in the underlying litigation" based on an earlier inconsistent position). Finally, it is clear that Candel would secure an unfair advantage from advancing the two inconsistent positions; having won a settlement payout by asserting that he was *not* incapacitated, he now seeks an insurance payout to which he would otherwise not be entitled by insisting he *was* incapacitated. As the Supreme Court recognized over a century ago, justice requires that "[w]here a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position." *Davis v. Wakelee*, 156 U.S. 680, 689 (1895).

Judicial estoppel thus precludes Candel from arguing that he was either incapacitated or disabled during the relevant period, and that being the case his lawsuit is untimely under the Policies.[5] Even if judicial estoppel did not apply, however, Unum would nonetheless be entitled to summary judgment because the record is clear that Candel was not legally incapacitated between 2005 and 2009. The parties have offered no authority defining "legal incapacity" under Illinois law in this context, and the Court through its own efforts has identified none.[6] Accordingly, the plain meaning of the language controls, and the most natural reasonable interpretation is one analogous to Illinois standards for mental incompetence. Other federal

---

[5] Although the issue of judicial estoppel was raised and developed in Unum's motion for summary judgment, Candel failed to explain the about-face in litigation posture and in fact fails to mention the issue of estoppel at all in his response. He has accordingly waived any objection to the application of judicial estoppel to this case. *See Grochocinski*, 719 F.3d at 795 n.7 (considering waived any arguments regarding the three judicial estoppel factors, as litigant failed to raise them).

[6] Candel suggests applying the definition of "disabled person" in 755 Ill. Comp. Stat. § 5/11a-2, which is defined broadly to encompass any person not fully able to manage his person or estate. Incapacity and disability are, however, distinct concepts. Given that the Policies in question concerned claims for disability, the one-year proof of loss deadline would be a total nullity if any claimant who qualified as disabled also automatically qualified as "legally incapacitated" such that the requirement of timely proof of loss was tolled.

courts tasked with interpreting the term "legally incapacitated" in the insurance contract context have reached a similar conclusion, holding that the term should be construed to mean that a claimant "either had been declared incapacitated by a court of law following a thorough examination of his or her competence or, at a minimum, had otherwise met the legal standards for mental incompetence under the relevant state law." *Falco v. UnumProvident Corp.*, No. 2:04-cv-04540, 2007 WL 1014568, at *7 (E.D.N.Y. Mar. 30, 2007).

Under Illinois law, "legal disability" acts to toll the statute of limitations in Illinois personal injury cases. 735 Ill. Comp. Stat. § 5/13–211. "A person suffers from a 'legal disability' where he or she is 'entirely without understanding or capacity to make or communicate decisions regarding his [or her] person and totally unable to manage his [or her] estate or financial affairs.'" *Basham v. Hunt*, 773 N.E.2d 1213, 1221 (Ill. App. Ct. 2002) (quoting *Hochbaum v. Casiano*, 686 N.E.2d 626, 631 (Ill. App. Ct. 1997)) (alterations in original); *see also Selvy v. Beigel*, 309 Ill. App. 3d 768, 776, 723 N.E.2d 702, 708-09 (1999) (emphasizing that to qualify as having a "legal disability" in Illinois, a person must show *both* inability to manage his own affairs *and* lack of understanding or capacity to make or communicate decisions). Candel has never been adjudicated incompetent or otherwise incapacitated in any context, and there is no evidence in the record from which a jury could reasonably find that Candel lacked the understanding or capacity to make or communicate decisions. To the contrary, as the above exhaustive recital of facts demonstrates, Candel's activities during the relevant period are utterly inconsistent with incapacity.

Throughout the period for which he claims incapacity, Candel continuously performed complex and highly skilled medical procedures. While Candel characterizes Dr. Zarif as the dominant force at Community Pathology Associates, Dr. Zarif's deposition testimony established

15

that Candel made his own diagnoses without Zarif's review. Candel also repeatedly – and successfully – applied for medical privileges at two hospitals, receiving approval for a wide variety of specialized procedures. Moreover, Candel founded a niche digital pathology practice, founded, incorporated, and acted as CFO of his own professional corporation, *and* acted as president of another pathology foundation all the way from 2003 to 2009. As CFO of Community Pathology Associates, he signed all the corporation's checks and paid himself substantial sums for his services as an executive. He taught himself a novel, state-of-the-art pathology technique – anal Pap smears – by reading medical journals, and rose to be "the" local practitioner of the technique. His income during this period never dipped below $200,000.00 annually, and Candel was of sufficiently sound mind to personally prepare and file his own income tax returns. This evidence that Candel was able to capably manage his own professional affairs is strong evidence that he was not legally incapacitated. *See Bloom v. Braun*, 739 N.E.2d 925, 933 (Ill. App. Ct. 2000) (holding that a party's employment in various jobs, financial management of her household, and ability to seek psychiatric help undermined her claim that she was under a legal disability for purposes of tolling the statute of limitations).

Moreover, contemporaneous assessments of Candel's competence uniformly found him to be sane and capable during the relevant period. Both hospitals at which he worked endorsed his competence to practice medicine, and Dr. Zarif – with whom Candel worked closely for years – certified that he was of sound mind and under no undue influence. Dr. Jaffe, Candel's treating psychiatrist in 2005, opined that Candel's anxiety and depression were under control and concluded that he understood his circumstances and was capable of making rational decisions. Dr. Halper diagnosed Candel with moderate difficulty in social/occupational functioning in

16

2008, but testified that his sole basis for this conclusion was Candel's self-reported personal conflicts with his partners at Associated Laboratory.

Finally, and most importantly, Candel's ability to file and win a lawsuit against his Associated Laboratory partners in 2008 is strong evidence of the capacity to manage his legal affairs. As discussed above, Candel helped his attorneys draft the fact section of the complaint and reviewed the complaint before filing. He also affirmatively asserted in that case – both in the complaint and in an affidavit – that he was not incapacitated in any way while working at Associated Laboratory, and swore under oath that he was competent to testify. That Candel was able to protect his contractual rights in the employment setting is strong evidence that he had the capacity to do the same in the insurance setting. *See Hunter v. Massachusetts Mut. Life Ins. Co*., 53 F. Supp. 3d 86, 93 n.4 (D.D.C. 2014) (granting summary judgment in favor of insurer on the basis that claim was not timely filed, because the claimant was not eligible for equitable tolling where "[p]articipation in legal ... proceedings in an effort to secure rights or benefits is an indication of mental capacity.").

Against this extensive evidence of Candel's competence between 2005 and 2009, Candel offers only his own deposition testimony and the opinion of Dr. Lahmeyer as supporting a different conclusion. Neither of these pieces of evidence, however, suffices to meet Candel's burden of producing competent evidence in order to survive summary judgment. Candel's own testimony about his competence during the relevant period is at best vague and equivocal, as he never directly testified that he was *incapable* of filing an insurance claim or understanding his own affairs. Instead, he goes on at length about how much stress he was under at the time and explains his failure to timely file a claim by citing denial, testifying:

> I didn't believe I was disabled. I didn't believe I was. I'm sorry. I didn't believe it. I thought that I was being victimized, and this was a railroad, and this is horrible. And then

> -- and then I realized I couldn't even fight these people…I think I was disabled. I think I've been disabled for some time, and it got to a point that I just couldn't handle it. I had a nervous breakdown. I don't know what it is. It's very tough for me to accept this. I was never trained to say, "Oh, yeah, you know, I just can't do it."
> …
> So that is what I think is -- is a problem for me. I don't know what that is. Do I want to say I'm disabled? God, it's terrible to say that. You know, that's like admitting you can't do it.

(Pl.'s Ex. 93, Dkt. # 134-9, pp. 62-63, 79.) Candel has offered no authority to suggest that psychological avoidance or unwillingness to confront his disability qualifies as legal incapacity, and indeed such an interpretation would render the contractual limitations period all but meaningless; anyone who failed to file a timely claim could simply assert that he or she didn't want to admit disability in order to escape the plain language of a contractual requirement. While it may have been difficult for Candel to confront his mental issues and file a claim, such difficulty does not amount to legal incapacity. *See Hall-Moten v. Smith*, No. 05 C 5510, 2009 WL 1033361, at *7 (N.D. Ill. Apr. 17, 2009) ("The court understands that it may have been inconvenient, or even quite difficult, for Hall to file his claims while he battled a variety of medical problems. However, there is simply no evidence that these problems impacted his ability to proceed as a legally competent adult.").

Dr. Lahmeyer also testified that Candel was incapable of filing an insurance claim between 2005 and 2009. For several reasons, however, Dr. Lahmeyer's testimony is not sufficient to meet Candel's burden of creating a triable issue of fact as to his incapacity. As an initial matter, "legally incapacitated" within the meaning of the Policies is a legal question; Dr. Lahmeyer is not qualified to opine on whether a claimant meets that legal standard, and as such his testimony that Candel was "incapable" of filing a claim is of limited probative value. Dr. Lahmeyer was also unable to explain how, if Candel was and remains "incapable" of filing a claim, he managed to do so in 2010. When questioned about this inconsistency, Dr. Lahmeyer

testified that while Candel could not file a claim on his own, he was capable of doing so (both in 2005 and in 2010) with the assistance of his insurance agent. (*See* Pl.'s Ex. 87, Dkt. # 134-4, pp. 246-50) ("All I can say is that he was able to file the form under the direction of [the insurance agent] but he was not able to do it independent of [the agent].") If Candel was just as capable of filing a claim in 2005 as he was in 2010, he was not without capacity to make or communicate decisions and was thus not incapacitated for purposes of excusing compliance with the Policies' time limits. Moreover, Dr. Lahmeyer made clear that his conclusion regarding Candel's incapacity was based solely on Candel's *emotional* refusal to confront his failures, as "[h]is ability to make effective emotional decisions such as recognizing he is suffering a disability and making a claim for disability insurance coverage is severely compromised." (Pl.'s Ex. 92, Dkt. # 134-8, p. 2; *see also* Pl.'s Ex. 89, Dkt. # 134-6. pp 13-14 (concluding that Candel was not competent because he "fought the concept of impairment and disability and thus was incapable of filing a claim for disability").) This is not the appropriate standard for legal incapacity, as Illinois courts have recognized in rejecting Dr. Lahmeyer's testimony in prior cases. *See, e.g.*, *Hochbaum v. Casiano*, 686 N.E.2d 626, 631 (Ill. App. Ct. 1997) (holding that "Dr. Lahmeyer's conclusion that plaintiff was incompetent was based on his belief that she was unable to make any decisions concerning legal matters," and therefore that "Dr. Lahmeyer's affidavit is insufficient as a matter of law."). Dr. Lahmeyer's opinion that Candel's emotional refusal to admit to disability amounts to legal incapacitation is erroneous, and his conclusions are therefore insufficient to meet Candel's burden for purposes of surviving summary judgment.

Because Candel has failed to create a triable issue of material fact as to legal incapacity, the Policies plainly bar the instant legal action and Unum is entitled to summary judgment.

**Conclusion**

For the reasons set forth above, Unum's motion for summary judgment [99] is granted and Candel's complaint is dismissed in its entirety with prejudice. Civil case terminated.


**SO ORDERED.**                                      **ENTERED:   August 24, 2015**

_____
**HON. RONALD A. GUZMÁN**
**United States District Judge**